# Exhibit B

# CHEESWRIGHTS
## NOTARIES PUBLIC

N P Ready
R M Campbell
J B Burgess
E Gardiner
A J Claudet
I A Rogers

A Grafton

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London **NOTARY PUBLIC** by royal authority duly admitted and sworn DO HEREBY CERTIFY the genuineness of the signature of **IAN KINNELL** subscribed to the award attached hereto, such signature being in the own, true and proper handwriting of the said Ian Kinnell, the sole arbitrator therein named and described.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this twentieth day of April in the year two thousand and one.

*Edward Gardiner* (signature)

E-mail: notary@cheeswrights.co.uk    www.cheeswrights.co.uk
10 Philpot Lane London EC3M 8BR      Canary Wharf Office
Tel : 020 7623 9477                   Tel : 020 7712 1565
Fax : 020 7623 5428
DX 627 / London City EC3




G.R

**APOSTILLE**
(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

1. Country: United Kingdom of Great Britain and Northern Ireland
   Pays: Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

   This public document / Le présent acte public

2. Has been signed by        Edward Gardiner
   a été signé par

3. Acting in the capacity of    Notary Public
   agissant en qualité de

4. Bears the seal/stamp of    The Said Notary Public
   est revêtu du sceau/timbre de

5. at London/à Londres                Certified/Attesté
                                      6. the/le   20 April 2007

7. by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
   par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8. Number/sous No    **H360684**

9. Stamp:
   timbre:                          10. Signature:   R. Bawden



*For the Secretary of State / Pour le Secrétaire d'Etat*

If this document is to be used in a country which is not party to the Hague Convention of 5 October 1961, it should be presented to the consular section of the mission representing that country. An apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is genuine. It does not mean that the contents of the document are correct or that the Foreign & Commonwealth Office approves of the contents.



IN THE MATTER OF THE ARBITRATION ACT 1996
AND IN THE MATTER OF AN ARBITRATION

BETWEEN :

    HANJIN SHIPPING CO. LTD., KOREA

<u>**Claimants**</u><br>(Disponent Owners)

- and -

    COMPANIA TRANSATLANTICA ESPANOLA S. A., MADRID

<u>**Respondents**</u><br>(Charterers)

("GREAT RIVER" - C/P 14.12.05)

# AWARD

### Introduction

1. According to a New York Produce Exchange ("NYPE") form of charterparty dated 14 December 2005 ("the charterparty"), Hanjin Shipping Co. Ltd. as Disponent Owners ("the Owners") let the vessel "Great River" ("the vessel") to Compania Transatlantica Espanola S.A. ("the Charterers") for a time charter period of about 40/45 days without guarantee.

2. The charterparty provided by Clauses 45 and 88 that disputes between the Owners and the Charterers should be referred to arbitration in London, with English law to apply. The reference was to be to three persons, one to be appointed by each party, and one by the two so chosen. As appears in more detail from the next section of this Award, disputes having arisen between the Owners and the Charterers, the Owners appointed me, the undersigned Ian Kinnell, presently of Makepeace Cottage, Staunton, Coleford, Gloucestershire GL16 8NX, as their nominated arbitrator. The Charterers, although called upon to do so, failed to appoint an arbitrator, and in the result I entered upon the reference as sole arbitrator. This is my Award which is final to the extent later indicated, but otherwise interim in the reference.

3. In outline, the Owners' claims which I have now been asked to determine were in respect of bunkers said to have been supplied to the vessel for account of the Charterers, but not paid for by them, and for a balance said to be due to the Owners on final account under the charterparty.

### The Reference to Arbitration

4. On 31 January 2007, I accepted an appointment as arbitrator nominated by the

*1*

Owners under the charterparty in respect of disputes said to have arisen between the Owners and the Charterers.

5. Subsequently, on 26 February 2007, I was advised by the Owners' London Solicitors that, also on 31 January, the Charterers had been advised of my appointment and had been given notice in writing calling upon them to appoint an arbitrator within 14 days. I was at this time also advised by those Solicitors that the Charterers had not responded to the notice referred to in the preceding sentence within the period allowed, and that, on 15 February, they had been given a further notice in writing stating that, if no appointment was made by them within seven clear days, I would be appointed to act as sole arbitrator in the reference. There had been, I was informed, no response to this message.

6. On 4 March 2007 I sought from the Owners' Solicitors evidence to confirm that the notices to which I have referred had been received by the Charterers, and contact details for the Charterers beyond a mere e-mail address. On 5 March I received from the Owners' Solicitors evidence which satisfied me that the Charterers were aware of the proceedings against them as well as details of the Charterers' address, telephone and facsimile numbers. The Charterers having meanwhile failed to appoint an arbitrator, on 6 March I informed both parties by faxed message that I had with effect from that date entered upon the reference as sole arbitrator. I am satisfied that this message was successfully transmitted to the Charterers, from whom, subsequently, I have in any event received direct communications. Although the Charterers have made submissions concerning the pursuit of the claims against them, they have not objected to my appointment as sole arbitrator in the reference.

### The Claimants' Application for an Interim Final Award

7. On 12 March 2007 the Owners' Solicitors applied to me for what they described as an "urgent / expedited Interim Final Award". On the same date they dispatched to the Charterers and to myself by courier with a copy of that application the Owners' Claim Submissions and supporting documents. From the documentary confirmation of delivery with which I was provided, I am satisfied that these documents were delivered to the Charterers on the morning of 13 March.

8. The grounds for the Owners' application for the claims to which I have referred to be dealt with on documents, and on an urgent basis, were stated to be the Charterers' lack of assets and the impending disposal of the Charterers as a company by way of sale. Liability, the Owners' Solicitors asserted, could readily be established on the basis of the available documents, and, while allowing the Charterers an opportunity to defend the claims against them, I should, it was submitted, then proceed as quickly as possible to an Award on liability, and upon so much of the quantum of the Owners' claims as could be dealt with on an interim basis, leaving open possible further Awards.

9.    On 15 March, I informed the Charterers by a faxed message sent and received at approximately 1030 hours GMT that, if they wished to object to my proceeding to deal with the matter on an urgent basis, they should provide me with their reasons for objection by 1800 hours GMT on 19 March.   In this message I made it clear that the Charterers would in any event have an opportunity to respond to the substance of the Owners' claims.

10.   At about 1215 hours GMT on 20 March, having had no response meanwhile from the Charterers to my message of 15 March, I advised them that I intended to proceed without delay to determine the Owners' claims.   At the same time I advised the Charterers that they might have until 1800 hours on 23 March within which to respond to the substance of the claims being made against them.   I decided to accede to the Owners' application to deal with the matter on an expedited basis on the ground that correspondence from the Charterers appended to the Owners' Claim Submissions satisfied me that the Charterers' financial situation was, at the very best, uncertain, and had been so for some time.   There was clear evidence of there having been a shortage of funds, and of creditors requiring attention, and it appeared that earlier plans for a sale may well have fallen through.

11.   When, on 22 March, I first heard directly from the Charterers (from, as I understand it, their Legal Department), two points only were made.   First, I was informed that the Charterers were in negotiation with the Owners' Spanish lawyer on a without prejudice basis, and, secondly, as to the Owners' bunkers related claim, it was submitted that the material submitted on the Owners' behalf did not support the claim made.   The latter appeared to be a point of substance, and I shall return to it in the next section of this Award.   Subsequently, however, in my message of 28 March (sent following an indication from the Owners' Solicitors that the Owners wished me to proceed), I advised the Charterers that the existence of without prejudice discussions was not a reason for my not proceeding with the matter.

### The Owners' Claims

12.   In their message of 22 March, the essence of the second point made by the Charterers was that, although the Owners claimed that they had made a payment in respect of the bunkers, and had taken an assignment from the party to whom the payment had been made, the documents produced by the Owners' Solicitors did not include a copy of the assignment, nor was there any other evidence of actual payment. Following an interim response on 23 March, in which they said that the assignment had already been produced to the Charterers on a without prejudice basis, a copy of the assignment relied upon was produced to me under cover of the Owners' Solicitors message of 27 March.   On 28 March (in the message to which I have referred in the preceding paragraph) I informed the Charterers that, while I intended to proceed, if there

3

was anything that they wished to add as to the substance of the claims, they might do so within 30 March.

13. In a message of 30 March, the Charterers once again made the point that there were on-going without prejudice negotiations, a point with which I have, and had, previously dealt, but they did make one substantive point based upon the assignment to which I have referred, namely that any claim in respect of bunkers should be limited to US$ 100,000, which was the sum actually paid by the Owners according to the assignment in question. The Charterers concluded by asking me to allow the negotiations a chance to succeed, having also said that, if the arbitration did continue, they would have to instruct English lawyers to present defence and counterclaim submissions. In so far as no hint of what these might contain - beyond the matters of defence to which I have already referred - has been disclosed, I saw no reason to depart from the course of action upon which I had previously decided, and of which the Charterers had previously been advised. It will be observed that I have heard nothing from the Charterers concerning the Owners' claim on final account.

14. In view of the point made by the Charterers as to the Owners' entitlement to recover no more than US$ 100,000, I gave them, as the claiming party, the opportunity for the last word on this topic. The Owners' Solicitors in response to this invitation made brief further submissions on 2 April. They pointed out that the assignment had been of the whole outstanding claim (*viz.* US$ 157,704.36 less the sum of US$ 20,000.00 which had been paid by the Charterers), and suggested that the object had been to avoid the possibility that NOT or Bominflot might pursue the Charterers for the balance of US$ 37,704.36. Any balance recovered by the Owners from the Charterers in excess of US$ 100,000 would, less interest and costs, be payable to NOT.

15. Taking first the Owners' bunker related claim, as one would expect in any time charterparty, the Charterers were responsible for the supply and cost of bunkers while the vessel was on hire (Clause 7 of the governing form). According to the documentary evidence presented to me, the bunkers in respect of which the claim has arisen were supplied to the vessel in February 2006. Under arrangements involving another intermediary the order was placed by Norwegian Oil Trading A/S ("NOT") (as Buyer) with Bominflot Inc. (as Seller), and the latter supplied the vessel, addressing their invoice - as is quite usual - to all possibly interested parties. The invoice was in the sum of US$ 157,704.36.

16. As also appears from the documents produced, NOT ultimately paid Bominflot's invoice, and took from that company an assignment of the debt. This was in December 2006. Since long before that date, however, The Owners had, without success, been pressing the Charterers to pay Bominflot's invoice. It appears that the Charterers did at some time negotiate directly with NOT, and it also appears that,

*4*

probably in November 2006, the Charterers did make a payment of US$ 20,000 towards what was outstanding. Before this, however, NOT were threatening to arrest the vessel and in order to protect themselves from the consequences of such a step being taken, which would have placed the Owners in breach of their own obligations towards the head owners of the vessel under a time charterparty, also on NYPE terms, the Owners (through their P & I Club) first put up security in NOT's favour, and, in due course, entered into a settlement with them.

17. It was as part of that settlement that the Owners took the assignment from NOT to which reference has previously been made. The agreement incorporating the assignment provided that, in consideration of an undertaking to pay to NOT the sum of US$ 100,000, neither NOT nor Bominflot would have any further claim against the vessel, the head owners or the Owners, and NOT would assign to the Owners their own (and Bominflot's) claims against, among others, the Charterers. Although the agreement entitled the Owners to pursue the Charterers, it did not require them to do so.

18. There was no challenge to the underlying facts concerning the supply of bunkers to the vessel in February 2006. The Charterers' failure to pay for these, and the consequent exposure of the Owners to claims from NOT and/or Bominflot, and/or the head owners were clearly the result of breaches of clauses 7 and/or 23 of the charterparty in respect of which the Owners are entitled to recover damages. The Owners are not, however, entitled to recover more by way of damages than the losses which they have suffered. Having regard to the terms of the agreement to which I have referred in the preceding paragraph, in my judgment they cannot therefore recover more than US$ 100,000 for the cost of the bunkers themselves as that is all that they have been required to pay, and in this respect I agree with the Charterers' argument. The Owners' claim is a claim in damages not in debt, and the agreement with NOT (and the assignment which it incorporates) is merely evidence of the loss which the Owners have suffered. Whether or not NOT (or Bominflot) might, but for the agreement, have pursued the Charterers is no concern of the Owners. As part of their damages, the Owners are, however, entitled to recover interest in my discretion on the sum that was paid to NOT (presumably on about 3 March 2007 in accordance with the terms of the assignment), as well as their costs in providing security for NOT's / Bominflot's claim, and of pursuing their present claim against the Charterers.

19. Turning to the Owners' claim in respect of the balance which they say is due to them on final account, save in one respect the material before me would not have been sufficient to satisfy me as to any particular sum being due in so far as the Owners have actually produced no evidence in the form of vouchers and suchlike directly in support of their claim. What is, however, said on their behalf is that, in documents provided to me, the Charterers have admitted their liability for the sum now claimed amounting to US$ 17,923.25. According to documents dated 14 June 2006, that does appear to

5

me to be correct, and it is of course to be noted that, in their correspondence with me, nothing has been said by the Charterers to contradict this part of the Owners' case. In the result I am satisfied that I should award the sum in question together with interest in my discretion with effect from 15 March 2006.

## Award

20. I now make the following Award -

    A. **I AWARD AND ADJUDGE** that in respect of the bunkers related claim the Charterers shall forthwith pay to the Owners the sum of US$ 100,000 together with compound interest thereon calculated with three monthly rests at the rate of 6.5% a year from 3 March 2007 until the date of payment.

    B. **I FURTHER AWARD AND ADJUDGE** that in respect of the claim on final account the Charterers shall forthwith pay to the Owners the sum of US$ 17,923.25 together with compound interest thereon calculated with three monthly rests at the rate of 6% a year from 15 March 2006 until the date of payment.

    C. **I DECLARE** that sub-paragraphs A and B, above, are finally determinative of (i) the sum payable to the Owners in respect of the bunkers supplied to the vessel together with interest thereon, and (ii) the Owners' claim on final account together with interest thereon, but, in relation to (i), above, **I RESERVE** my jurisdiction to make a further Award in respect of the Owners' costs in providing security in respect of possible claims against them by NOT and/or Bominflot prior to 3 March 2007.

    D. **I FURTHER AWARD AND DETERMINE** that the Charterers shall bear the costs of this Award amounting to £1,375.00, inclusive of my appointment fee and interlocutory fees, and that, to the extent that the Owners shall in the first instance have paid the whole or any part of such costs, the amount so paid shall immediately be repaid to the Owners by the Charterers together with compound interest thereon calculated with three monthly rests at the rate of 7% a year from the date of payment by the Owners until the date of repayment to them by the Charterers.

    E. **I FURTHER AWARD AND DETERMINE** that the Charterers shall bear their own and the Owners' costs in the reference leading to this Award to be assessed in accordance with section 63 (5) of the Arbitration Act 1996, and **I RESERVE** my jurisdiction to make an Award in respect of the Owners' said costs, including an Award of interest, in the absence of agreement between the parties.

    F. Save as appears from sub-paragraphs C and E hereof this Award is finally determinative of the Owners' claims referred to herein, but of no other dispute between the Owners and the Charterers.

G. The seat of the arbitration in which this Award is made is within England and Wales.

Dated this ....2...... day of April 2007

_____
(Ian Kinnell - Sole arbitrator)

_____
(Witness)

7

# CHEESWRIGHTS
## NOTARIES PUBLIC

N P Ready
R M Campbell
J B Burgess
E Gardiner
A J Claudet
I A Rogers

A Grafton

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London **NOTARY PUBLIC** by royal authority duly admitted and sworn DO HEREBY CERTIFY the genuineness of the signature of **IAN KINNELL** subscribed to the document hereunto annexed, such signature being in the own, true and proper handwriting of the said Ian Kinnell, the sole arbitrator therein named and described.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this second day of July in the year two thousand and seven.

*Edward Gardiner*

E-mail : notary@cheeswrights.co.uk        www.cheeswrights.co.uk
10 Philpot Lane London EC3M 8BR           Canary Wharf Office
Tel  : 020 7623 9477                      Tel : 020 7712 1565
Fax : 020 7623 5428
              DX 627 / London City EC3



SCRIVENER NOTARIES

**APOSTILLE**
(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

**UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND**

1. Country: United Kingdom of Great Britain and Northern Ireland
   Pays: Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

   This public document / Le présent acte public

2. Has been signed by        Edward Gardiner
   a été signé par

3. Acting in the capacity of   Notary Public
   agissant en qualité de

4. Bears the seal/stamp of     The Said Notary Public
   est revêtu du sceau/timbre de

                                    Certified/Attesté
5. at London/à Londres         6. the/le   02 July 2007

7. by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
   par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8. Number/sous No    H441341

9. Stamp:                      10. Signature:   Alex Crockett
   timbre:



*For the Secretary of State / Pour le Secrétaire d'Etat*

If this document is to be used in a country which is not party to the Hague Convention of 5 October 1961, it should be presented to the consular section of the mission representing that country. An apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is genuine. It does not mean that the contents of the document are correct or that the Foreign & Commonwealth Office approves of the contents.

IN THE MATTER OF THE ARBITRATION ACT 1996
AND IN THE MATTER OF AN ARBITRATION

BETWEEN :

    HANJIN SHIPPING CO. LTD., KOREA
                                              **Claimants**
                                    (Disponent Owners)

- and -

    COMPANIA TRANSATLANTICA ESPANOLA S. A., MADRID
                                                 **Respondents**
                                                  (Charterers)

("GREAT RIVER" - C/P 14.12.05)

# FURTHER AWARD - ASSESSMENT OF COSTS

## Introduction

1.    On 2 April 2007, acting as sole arbitrator, I made an Award in this matter in respect of claims made by the Claimants, to whom I shall continue to refer as "the Owners", against the Respondents, to whom I shall continue to refer as "the Charterers", arising out of the above charterparty. Having made an Award in the Owners' favour in respect of the greater part of their claims, I also awarded to them the the costs of my Award, and, in sub-paragraph F of paragraph 20 of that Award, I made an Award in the Owners' favour in respect of their own costs in the reference.

2.    That Award in respect of the Owners' costs was in the following terms -

> "...... the Charterers shall bear their own and the Owners' costs in the reference leading to this Award to be assessed in accordance with section 63 (5) of the Arbitration Act 1996, and I RESERVE my jurisdiction to make an Award in respect of the Owners' said costs, including an Award of interest, in the absence of agreement between the parties."

3.    No agreement having been reached between the parties as to the assessment of the Owners' costs, this Award is in respect of my own assessment.

4.    The Owners put forward their claim for the assessment of their costs by me in a message from their Solicitors addressed to me dated 29 May 2007. Annexed to that message was a Schedule of the costs that were suggested to be recoverable, and, having investigated the position, I am satisfied that the foregoing reached the Charterers by facsimile on the same day. On 30 May, I sent a message by facsimile to the Charterers. I am satisfied from my own records that this message reached the

Charterers.    In my message of 30 May, I stated that I would allow the Charterers 14 days to respond to the Owners' claim, and I advised the Charterers that, if I did not hear from them within that period, I would proceed with my assessment without further notice. I did not hear from the Charterers within the time allowed, nor have I done so as at the date of this Award.

5.    Although I had no reason to suppose otherwise, on 14 June I sought confirmation from a partner in the Owners' Solicitors that the costs sought from the Charterers did not exceed the costs paid or payable by or on behalf of the Owners. I received confirmation to that effect on the same day.

6.    As to section 63 (5) of the Arbitration Act 1996, referred to in the quotation from my principal Award set out in paragraph 2, above, as I have not determined otherwise, my assessment will proceed in accordance with the following provisions of that sub-section, namely -

   (a)    the recoverable costs of the arbitration shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and

   b)    any doubt as to whether costs were reasonably incurred or were reasonable in amount shall be resolved in favour of the paying party.

7.    In the ensuing section of this Award I shall review the elements making up the Owners' claim and express my conclusions upon them.

### The Owners' Claim

8.    <u>Charge out Rates</u>    These are stated in the Owners' Schedule for all fee earners within the Owners' Solicitors who have been involved in this matter.    The rates in question are, in my opinion, generally in line with what I would expect in the case of an established and well respected firm in the City of London dealing with cases such as the present.    Having given the matter careful thought, I have, however, come to the conclusion that the charge out rate for the Assistant Solicitor is higher than I consider to be appropriate.    I shall apply the rate of £225 per hour as against the rate of £250 sought.    I wish to make it clear that this conclusion should not in any way be regarded as a comment upon, or a criticism of, the individual concerned.

9.    <u>Work Done</u>    I shall take these items in order by reference to the sub-headings that appear in the Owners' Schedule.

   <u>Claimants</u>    My only concern under this head relates to the 20 letters / faxes recorded for the Assistant Solicitor.    Given the limited scope of the Owners' claims, I shall restrict the claim to 15 letters / faxes.    At the £225 rate that I am applying for the

2

Assistant Solicitor, the totals under this head are -Partner £120.00; Assistant Solicitor £427.50.

Respondents    My only adjustment is on rate; I allow £135.00.

Arbitrator    My only adjustment is on rate for the Assistant Solicitor; I allow - Partner £30.00; Assistant Solicitor £382.50.

Notaries    The only references to Notaries that I have seen relate to the period after the making of my Award    Any costs then incurred, while no doubt reasonably incurred and reasonable in amount, do not form part of the costs of the arbitration.    I must, therefore, disallow this item entirely.

Spanish Lawyers    Although, as will be seen, I have serious reservations about the extent of the involvement of the Owners" Spanish lawyers, five letters / faxes to them appears reasonable.    Making an adjustment for rate, I will allow - Assistant Solicitor £112.50.

The total allowed under this paragraph is £1,207.50.

10    **Documents**

Preparation, Perusal and Consideration    Given the limited scope of the Owners' claims, and of the evidence presented in support of them, I am bound to say that, generally, the hours claimed appear to me to be excessive.    Looking at the matter in the round, I have decided to disallow three and a half hours of the Partner's time, and nine hours of the Assistant Solicitor's time; I shall leave the claim in respect of the Legal Assistant.    At the governing rates, I allow - Partner £1,500.00; Assistant Solicitor £4,500.00; Legal Assistant £560.00.

Preparation of Costs Schedule    I will allow this in the sum claimed, viz. £577.50.

The total of the above is £7,137.50.

11    **Disbursements**    I shall again follow the order in the Owners' Schedule.

Spanish lawyers    This item is is of some concern.    By way of background, it has to be stated that the Owners' claims arose under a charterparty that was in all respects governed by English law, and did not appear to raise any jurisdictional issues. Although the factual situation relating to the claim in respect of bunkers supplied to the vessel was not entirely straightforward, this did not of itself involve Spanish law, nor,

3

indeed, any necessity to engage Spanish lawyers.    Two matters only, it seems to me, did, however, make it reasonable to involve such lawyers to some extent.    First, the Owners, entirely reasonably in my opinion, sought to persuade me that there was good reason for concern as to the Charterers' financial position and legal status, and that, accordingly, I should deal with the case on an urgent basis.    Secondly, as is apparent from the introductory sections of my earlier Award, I was appointed sole arbitrator because of the Charterers' failure to make any appointment on their own behalf, and a prudent Solicitor would, in my opinion, be likely to seek comfort as to the acceptability of the course adopted within the jurisdiction in which the process of enforcement would be most likely to be undertaken.

The sums claimed in respect of the Owners' Spanish lawyers were the subject of two bills, one dated 27 April, and the second dated 28 May 2007.    As to these bills, the first comment that I would make is that I fail to see on what basis any item billed in respect of a date after the publication of my earlier Award on 2 April 2007 can be said to have formed part of "the costs of the arbitration" referred to at section 59 of the Arbitration Act 1996.    I therefore disallow these items in their entirety.    This, of course, excludes the whole of the bill of 28 May, which in any event expressly refers to matters such as notarisation, with a view to recovery and/or enforcement.    For the same reason, the Notary's fees are also disallowed.

As to items referable to dates prior to the making of my earlier Award, it rather appears that both before and after my appointment, the Spanish lawyers' involvement had little connection with the arbitration, being much concerned, however, with the Owners, with the Owners' P & I Club, and with the Charterers themselves.    There were, as I would expect, some communications between the Spanish lawyers and the Owners' Solicitors in London, but, in the result, all that I am prepared to allow in respect of the Spanish lawyers' involvement in the arbitration is based upon my own assessment of what would be reasonable in the context of the two matters referred to in the opening sub-paragraph of this section.    I will allow a total of three and a half hours at € 300 per hour (€ 1,050), equivalent to £715.75.

<u>Irish Lawyers' Fees</u>    Strictly speaking, this is not a claim in respect of costs, but it nonetheless falls within my present jurisdiction by reason of the reservations contained in my earlier Award.    The Irish lawyers were concerned with the possible arrest of the vessel in Dublin, and with the provision of security that prevented this.    The amount appears to me to be reasonable, and it is allowed in the sum of £1,100.

<u>Investigators' Fees</u>  No detail of what was undertaken was provided to me, and, particularly bearing in mind the terms of section 63 (5) (b) of the 1996 Act, it is to be inferred that the Owners / their Solicitors were content to leave it to my own judgment whether this part of their claim should be allowed.    It seems likely that the services

*4*

were provided in order to enable an assessment to be made as to whether or not the Owners might be able to secure security in respect of the claims adjudicated upon by me in my earlier Award. The acquisition of security for a claim that is to be pursued does not, however, form part of the arbitral process, and I disallow this head of claim in its entirety.

<u>US Lawyers Fees</u>   As I would expect, the US Lawyers have provided a detailed bill for, in total, US$ 4,458.62.   This bill covered a period between 10 November 2006 and 2 February 2007.   In so far as the supply of bunkers to the vessel that gave rise to the principal dispute took place in the United States, I consider it to have been reasonable for the Owners / their Solicitors to have consulted United States lawyers when the possibility of vessel arrest threatened: strictly speaking the costs involved are not costs but damages, and they parallel those relating to the Irish lawyers.   But, while I have no quarrel whatsoever with the hourly rates charged, I have taken the view that the time spent by the US lawyers, particularly in the early stages of their involvement, was greater than I would have expected.   Rather than attempt any artificial breakdown, I have decided that it will give effect my concerns if I make a global reduction of 15% from the total sum claimed.   In the result I allow £1,904.39 under this head.

<u>International telephones etc.</u>   No explanation has been as to why these items should not be treated as normal overhead items.   They are disallowed.

For Disbursements, the total allowed is £3,720.14.

12.   **Claims - Summary**       (References are to the above paragraphs)

| | |
|---|---|
| 9. | £ 1,207.50 |
| 10. | 7,137.50 |
| 11. | 3,720.14 |
| TOTAL | £12,065.14 |

13.   **Interest**   I shall award to the Owners the sum set out in the preceding paragraph, and upon that sum I shall award interest in my discretion.

14.   **Costs**   Although I have assessed costs (including costs as damages) in a sum below that claimed by the Owners, they are entitled to a substantial proportion of what they claimed.   In so far as there can be no equivalent in arbitration to the judgment in default obtained in Court, the failure of the Charterers to participate has done nothing to ease my task; if anything, it has increased its burden.   The Charterers must therefore bear the costs of this assessment amounting to £820.00.   As to the Owners' costs of the assessment, the Schedule included the costs of its preparation, and these form part of the costs of the arbitration.

15  **Award**      I now make the following Award -

A.   **I AWARD, DETERMINE AND ADJUDGE** that, in respect of their claim for recoverable costs in the arbitration leading to my Award of 2 April 2007, and to this Award, and their claim for costs as damages reserved in my Award of 2 April 2007, the Owners are entitled to recover from the Charterers the sum of £12,065.14 and no more **AND I DIRECT** that the Charterers shall forthwith pay to the Owners the said sum of £12,065.14 together with compound interest thereon calculated with three monthly rests at the rate of 7.5% a year from 2 April 2007 until the date of payment.

B.   **I FURTHER AWARD AND DETERMINE** that the Charterers shall bear the costs of this Award amounting to £820.00, and, to the extent that the Owners shall in the first instance have paid the whole or any part of such costs, the amount so paid shall immediately be repaid to the Owners by the Charterers together with compound interest thereon calculated with three monthly rests at the rate of 7.5% a year from the date of payment by the Owners until the date of repayment to them by the Charterers.

C.   **I DECLARE** that sub-paragraphs A and B, above, are finally determinative of the claims adjudicated upon in my Award of 2 April 2007 and in this Award.

D.   The seat of the arbitration in which this Award is made remains within England and Wales.

Dated this 18 day of June 2007

..................................................
(Sole Arbitrator)

..................................................
(Witness)

6

IN THE MATTER OF THE ARBITRATION ACT 1996
AND IN THE MATTER OF AN ARBITRATION

BETWEEN :

HANJIN SHIPPING CO. LTD., KOREA

**Claimants**

(Disponent Owners)

- and -

COMPANIA TRANSATLANTICA ESPANOLA S. A., MADRID

**Respondents**

(Charterers)

("GREAT RIVER" - C/P 14.12.05)

## FURTHER AWARD - ASSESSMENT OF COSTS